IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| STAFFORD HILLS PROPERTIES LLC and ZUPANCIC RATHBONE LAW GROUP PC, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 140184N |
| v. | ) ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered May 1, 2015. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appeal the real market value and exception value of property identified as Account 00345380 (subject property) for the 2013-14 tax year. A two-day trial was held in the Oregon Tax Courtroom beginning on October 29, 2014, in Salem, Oregon. Christopher K. Robinson, Attorney, appeared on behalf of Plaintiffs. C. Spencer Powell (Powell), MAI, and James Zupancic (Zupancic), subject property developer, testified for Plaintiffs. Kathleen J. Rastetter, Clackamas County Counsel, appeared on behalf of Defendant. David W. Sohm (Sohm), Registered Appraiser 3, testified for Defendant. Plaintiffs' Exhibits 1-2, 5-8, and 10-17 and Defendant's Exhibits A through E and G were received without objection.[1] The parties submitted written closing arguments.

/ / /

/ / /

---

[1] The following Exhibits are subject to the protective order: Plaintiffs' Exhibit 1 at 75, 76, 78, 81, 82, 105, 172 through 201, 203 through 263, 265 through 285; Plaintiffs' Exhibits 2, 6, 7, and 17; and Defendant's Exhibit B.

I. STATEMENT OF FACTS

Plaintiffs own and operate the subject property, a 90,708-square foot (gross) multi-purpose facility devoted to tennis and fitness activities.[2] (Ptfs' Ex 1 at 35.) Powell testified that the subject property was primarily constructed in 2012 and was 97.6 percent completed as of the January 1, 2013, valuation date. (*See id.* at 53.) Sohm wrote that parts of the subject property were incomplete as of the date of site inspection, December 26, 2012. (Def's Ex A at 29.) But he concluded that "the entire facility was complete" on January 1, 2013, based on an aerial photograph from Google Earth. *Id.*

A. *Subject Property Site*

The subject property is located on 15.5 acres in the Stafford Hills neighborhood of Tualatin, 12 miles south of Portland.[3] (Ptfs' Ex 1 at 35, 44.) Sohm wrote that that area contains "predominantly upscale homes" on well-maintained hillside lots. (Def's Ex A at 9.) The subject property is located close to I-5 and I-205. (*Id.* at 18, 22.) SW Nyberg Lane on the west side of the subject property connects to I-5. (Def's Ex A at 22.) Powell wrote that Nyberg Lane provides average exposure. (Ptfs' Ex 1 at 45.)

The subject property land was purchased on May 4, 2009, by James D. and Maria C. Zupancic for $895,000, or $57,742 per gross acre or $182,653 per developable area. (Ptfs' Ex 1 at 36.) That "sale occurred prior to any wetland mitigation or the issuance of the conditional use permit * * *." (*Id.*)

The subject property site is zoned Low Density Residential (RL), the purpose of which is "to provide low density residential areas in the city * * *." (Ptfs' Ex 1 at 46.) The City of

---

[2] Powell wrote the subject property's net rentable area is 89,532 square feet. (Ptfs' Ex 1 at 35.)

[3] Sohm wrote that the subject property is 15.23 acres. (Def's Ex A at 2, 21.)

Tualatin issued a conditional use permit for construction of the subject property facility; the permit will expire if the subject property facility ceases to operate for two years. (Ptfs' Ex 1 at 47; Ex 10 at 3-4.) To obtain the permit, Plaintiffs were required to satisfy several conditions, including the development of an Architectural Review plan to establish landscaping buffers between the facility and existing neighbors and a Parking Management Plan to ensure sufficient on-site parking and to restrict off-site parking in city-regulated space. (Ptfs' Ex 5 at 1-2.) The conditional use permit also requires Plaintiffs to close the facility by 10:00 p.m. nightly. (*Id.*)

Powell testified that a portion of the subject property site containing the tennis facility is located in the Flood Plain District and requires additional flood insurance, the cost of which is about $12,000 annually. (*See* Ptfs' Ex 1 at 47-49; Ptfs' Ex 6 at 1.) "A utility easement runs diagonally through the site * * *." (Def's Ex A at 22.) Sohm wrote that the "unsightly overhead power lines which cross the subject property" are a negative factor for the property. (*Id.* at 24.)

Powell wrote that 4.9 acres of the subject property site is developable land. (Ptfs' Ex 1 at 44.) Powell and Zupancic each testified that the remaining 10.6 acres falls within wetlands and other protected areas under the Natural Resource Protection Overlay District, which required significant support to preserve the natural habitat to comply with restrictions set by the Oregon Department of State Lands.[4] (*See id.* at 47, 49; *see also* Def's Exhibit A at 22.) They each testified that the initial wetlands mitigation natural resource enhancement work cost about $1.4 million and the restrictions render 10.6 acres of the subject property undevelopable. (*See* Ptfs' Exhibit 1 at 50.) The subject property wetland fill permit requires long-term maintenance and monitoring. (Def's Ex A at 22-23.)

/ / /

---

[4] Sohm wrote that the undevelopable wetlands measures 10.31 acres. (Def's Ex A at 21.)

B.      *Subject Property Improvements*

Powell described the subject property as "a full service health club * * *." (Ptfs' Ex 1 at 35.) Sohm described the subject property as "a good quality tennis center * * *." (Def's Ex A at 29.) Powell testified that the subject property facility includes Building A, a 72,188-square-foot building with health club and tennis space; Building B, a 17,344-square-foot building with office, activity, wellness space; Building C, a 176-square-foot building with fountain equipment; and Building D, a 1,000-square-foot building with pool equipment.[5] (*See* Ptfs' Ex 1 at 5, 53.) He testified that Plaintiffs designed the subject facility as two separate buildings (A and B) due to the utility easement. Powell determined that the facility's effective age was zero with a remaining economic life of 45 years. (*Id.* at 53.) The facility was in very good condition according to Powell and in "good to excellent condition" according to Sohm. (*Id.*; Def's Ex A at 6.)

Powell wrote that Building A is LEED certified and includes 51,966 square feet devoted to the indoor tennis facility and 20,222 square feet used as the health club. (Ptfs' Ex 1 at 52-53.) Building A includes "a two-story clubhouse with foyer, reception, lounge with gas fireplace, café, men and women's locker rooms (each equipped with a sauna), and several fitness/cardio/weight related rooms and open space." (*Id.* at 52.) Sohm wrote that it also includes a Pro Shop, a covered deck overlooking the pool, and a viewing platform in the tennis area. (Def's Ex A at 7, 27.) The indoor tennis courts are built four feet below the 100-year flood plain elevation. (*Id.* at 27.) To address flood potential, the walls have overhead doors to allow air flow, and, if necessary, flood water passage. (*Id.*)

/ / /

_____

[5] Sohm provided the following measurements for Buildings A and B: Building A is 69,535 square feet and Building B is 16,788 square feet. (Def's Ex A at 2, 7, 27.)

Building B is a two-story LEED certified building dedicated to wellness activities and it includes locker rooms, a day spa, a day care center, physical therapy space leased to Therapeutic Associates, group exercise rooms, and several conference and meeting spaces, one of which contains a commercial kitchen. (*See* Ptfs' Ex 1 at 52; Def's Ex A at 7, 27.) The west side of Building B has a covered balcony and a fenced play area for the day care center. (Ptfs' Ex 1 at 52; Def's Ex A at 27-28.)

Powell wrote that the subject property includes "an outdoor 25-yard heated swimming pool, spa, children's fountain, and three fenced outdoor tennis courts." (Ptfs' Ex 1 at 54.) The facility is bordered by "concrete walkways, yard and lot lighting, a monument sign, perimeter fencing around the east, south[,] and west elevations, and concrete retaining walls." (*Id.*)

Powell testified that the subject property includes a parking lot with 138 spaces for a parking ratio of 1.54 spaces per 1,000 rentable square-feet, which Powell characterized as "low; albeit, within the range of other clubs as presented in the Sales Comparison Approach." (Ptfs' Ex 1 at 54.) He testified that 75 of the spaces cannot be used before 8:00 a.m. Zupancic testified that members have complained about parking.

C.      *Subject Property Operations and Market*

Sohm wrote that Plaintiffs offer fitness memberships and tennis memberships; the tennis memberships cost more. (Def's Ex A at 50-51.) Zupancic testified that tennis members are typically willing to drive a further distance to the club and are more stable, whereas fitness members turn over more frequently. He testified that tennis members have higher expectations. Zupancic testified that the fitness market is highly competitive and he tries to distinguish the subject property from the low-cost/high-volume clubs. He testified that the subject property facility has a greater capacity for fitness memberships than tennis memberships.

Sohm testified that, based on his review of tennis industry association information and his conversations with club managers, interest in tennis was growing in 2011 and 2012. He provided a February 8, 2012, newspaper article, quoting Zupancic that "[t]here hasn't been a new tennis facility built in the Portland area in the last 35 years, and there is really nothing in the area that will be comparable, except perhaps the Multnomah Athletic Club." (Def's Ex A at 92 (internal quotation marks omitted).) Sohm testified that he identified nine private tennis clubs that compete with the subject property, and he identified two facilities that compete with the subject property for fitness memberships: Club Sport and 24-Hour Fitness, both in Tualatin. (*See id.* at 54-61.)

D.    *The Parties' Appraisals*

Powell and Sohm each testified that they appraised the subject property as of January 1, 2013. Both appraisers concluded that the subject property's highest and best use as if vacant was residential development. (*See* Ptfs' Ex 1 at 62; Def's Ex A at 64.) They also agreed that the subject property's highest and best use as improved was its existing use as a tennis and fitness club. (Ptfs' Ex 1 at 63; Def's Ex A at 64.)

1.    Cost Approach

a.    Land Value

Powell and Sohm each selected land sales with "similar residential zoning" as the subject property. (Ptfs' Ex 1 at 69; Def's Ex A at 66-67.) Powell identified three bare land sales that he considered comparable to the subject property's developable land, which ranged in size from 9.99 to 19.43 acres and sold between August 2010 and January 2014. (Ptfs' Ex 1 at 66-69, 71.) He wrote that he viewed the subject property as bracketed by land sales 2 and 3. (*Id*. at 69.) Powell identified land sale 2, purchased for $257,334 per acre, as "the May 2011 sale of 19.43

acres of R-7 zoned land located in Tigard." (*Id.* at 67.) He wrote that the land was purchased by the City of Tigard "for future park space." (*Id.*) Powell concluded land sale 2 was "a low indicator based on the larger size, inferior zone/density, access and exposure." (*Id.* at 68.)

Powell described land sale 3 as an "assemblage of three parcels purchased between May 2011 and January 2014." (Ptfs' Ex 1 at 68.) Land sale 3 totaled 11.99 acres and, prior to sale, was the site of the Tualatin Elementary School. (*Id.* at 68, 71.) The sale price of all three parcels totaled $402,007 per-acre. (*Id*. at 71.) Land sale 3 was purchased "to construct a new 100,000 SF +/- skilled nursing and assisted living facility * * *." (*Id.* at 68.) Powell wrote that the buyer incurred additional undisclosed costs to safely demolish the existing structures and to pay off the buyer's remaining promissory note; the demolition costs were not included in Powell's analysis. (*Id*. at 68-69.) He concluded sale 3 was a high indicator. (*Id.*) Powell concluded a land value of $325,000 per acre, or $1,600,000 total, rounded, for the subject property's developable land. (*Id.* at 69-70.) Because Powell determined it would not be cost-effective to mitigate the 10.6 acres of undevelopable land, he assigned no value to that portion of the subject property. (*Id.* at 69-70.)

Sohm utilized five bare land sales between 2006 and 2012 to estimate the real market value of the subject property's developable land. (Def's Ex A at 66-67.) His land sales ranged in size from 5.79 to 19.63 acres and ranged in price from $5.45 to $8.19 per square foot. (*Id.*) Sohm placed most weight on land sale 5 because it was "the most recent in date of sale" and was "comparable in size and topography to the subject" property. (*Id.* at 67.) Land sale 5 was a 5.79 acre parcel that sold in June 2012 for $5.45 per square foot. (*Id.*) It was purchased to develop 35 single family lots. (*Id.*) Sohm placed "secondary weight" on land sale 4, which is Powell's land sale 2 that sold for $5.91 per square foot. (*Id.*) Sohm determined a value of $5.50 per square

/ / /

foot, which he adjusted downward by 10 percent due to the subject property's floodplain location, and concluded a developable land real market value of $1,069,400. (*Id*.)

To establish the subject property's undevelopable land real market value, Sohm reviewed four comparable land sales between June 2009 and March 2010 that ranged in size from 16.53 to 27.47 acres and ranged in price from $5,841 to $18,202 per acre. (Def's Ex A at 67-68.) Sohm wrote that all four land sales were purchased for use as open space. (*Id.* at 68.) He determined that land sale 2, which sold for $11,250 per acre in September 2009, was the most similar to the subject property based on its topography. (*Id*. at 69.) Sohm determined a value of $11,250 per acre, or $115,088, for the subject property's undevelopable land and concluded a total land real market value of $1,184,488 for the subject property. (*Id*. at 69.)

b.      Improvements value

Powell considered both the subject property's actual construction cost and its estimated replacement cost using the Marshall & Swift Valuation Service (MVS). (Ptfs' Ex 1 at 75.) He testified that the actual total construction cost was $11,201,595, as reflected on the July 10, 2012, change order. (*Id.* at 75-76.) Powell wrote that that total included "profit and overhead to the builder and a contingency allowance." (*Id.* at 75.) Powell added 10 percent for indirect costs for a total improvements cost of $12,321,755. (*Id.*) Zupancic testified that the subject property's actual construction costs as of January 1, 2013, were less than reported because the $319,000 bid for "Solar PV" never happened. (*See* Def's Ex B at 5.) He testified that about $300,000 of work was completed after January 1, 2013. Zupancic testified that, of the "site work," about $1.4 million was for wetlands mitigation required by state and federal agencies to develop the subject property site.   He testified that the wetlands mitigation cost should not be included in the subject property's actual cost because it is an extraordinary site development cost.

FINAL DECISION  TC-MD 140184N                                                                          8

Using MVS, Powell determined the subject property's replacement cost was $12,330,184 including total direct costs of $11,209,258 and 10 percent indirect costs. (Ptfs' Ex 1 at 77-78.)

Powell wrote that "[a]ctual construction costs are typically the most reliable source for improvement costs." (Ptfs' Ex 1 at 78.) As a result, he concluded a total improvements cost of $12,321,755 based on the subject property's actual cost. (*Id.*) Powell calculated 10 percent entrepreneurial profit of $1,392,176 based on the total improvements cost plus land value. (*Id.*) He determined that "an allocation for functional obsolescence of 35.00% is indicated" based on the difference between his conclusion under the cost approach as compared with the income and sales comparison approaches.[6] (*Id.* at 79.) Powell testified that the following contributed to the subject property's functional obsolescence: the conditional use permit restrictions, the tennis courts located in the floodplain, the flood insurance, the wetlands mitigation, and the necessity of constructing two buildings rather than one. As a result, Powell deducted functional obsolescence of $4,799,876 for a total indicated value of $10,515,000, rounded, under the cost approach. (*See id.* at 81.) Powell acknowledged that the total indicated value under the cost approach without a deduction for functional obsolescence is $15,315,000, rounded. (*See id.* at 79.)

Sohm testified that he also considered both the subject property's actual cost and its replacement cost estimated using MVS. (*See* Def's Ex A at 69-73.) Like Powell, Sohm used the subject property's actual cost of $11,201,995. (*Id.* at 73.) Sohm added indirect costs of 15 percent, or $1,680,239; entrepreneurial profit and overhead of 10 percent, or $1,406,632; and land value, or $1,184,488, for a total indicated value of $15,473,000, rounded, under the cost

---

[6] On cross examination, Powell agreed with an excerpt from *The Appraisal of Real Estate* stating in part that, "in most applications of the cost approach, the need to estimate the functional obsolescence attributable to an incurable superadequacy is eliminated by using replacement cost instead of reproduction cost[.]" (Def's Ex G at 3.) However, Sohm testified that both appraisers effectively used reproduction cost because they relied on actual costs.

approach. (*Id.* at 74-75.) He testified that he selected 15 percent indirect costs based on the typical range for "specialized" properties. (*See id.* at 74.) Sohm testified that he did not find the subject property suffered from functional obsolescence or any other form of depreciation, noting that it was brand new as of January 1, 2013. (*See id.*) He testified that, if he had found any functional obsolescence, he would have capitalized it over the life of the subject property, which is the correct method under the 14th edition of *The Appraisal of Real Estate*.

2.      Sales Comparison Approach

Powell utilized five sales between March 2012 and July 2014 and one pending sale to determine the subject property's real market value under the sales comparison approach. (Ptfs' Ex 1 at 93.) Powell's sales ranged from $33.41 to $206.67 per square-foot. (*Id.*) Powell testified that none of his comparable sales were combination fitness and tennis facilities and the condition of each sale was inferior to that of the subject property. Only sale 2 of Courtside Fitness in Salem included tennis courts. (*Id.* at 94.)

Powell wrote that the subject property's "health club and activity center are bracketed by [sales] 5 and 6[.]" (Ptfs' Ex 1 at 98.) Sale 5 is the 88,862 square-foot Riverplace Sport & Spa in Southwest Portland that was built in 1986 and renovated in 2007. (*Id.* at 99.) Powell testified that the lender repossessed the property from the prior owner and sold it to an investor in July 2014 for $10,000,000. (*See id.* at 96, 99.) Powell determined that sale 5's location and zoning were superior but "[c]ondition and quality [were] inferior." (*Id.* at 96.) He adjusted sale 5 downward by $100,000 for deferred maintenance and by $250,000 for personal property included with the sale, for an adjusted sale price of $9,650,000, or $173.99 per square foot. (*Id.* at 96, 99.)

/ / /

Powell's pending sale 6 was of the 74,488-square-foot Duniway Athletic Club in Southwest Portland, which was built in 1977 and was subsequently renovated. (Ptfs' Ex 1 at 97, 99.) He wrote that it "suffered from significant deferred maintenance including the roof and HVAC system. * * * The cost to cure the deferred maintenance was quoted at 'a couple million.' " (*Id.* at 97.) Powell wrote that the property had been "listed for roughly three years, with a most recent price point of $11,700,000 ($170.31/SF)." (*Id.*) Powell interviewed the broker, who "indicated that he has had three offers in the last 40 to 45 days, all at $10,000,000. The accepted offer is to an investor who plans to redevelop the building interior as creative office space." (*Id.*) Powell concluded pending sale 6 indicated a value of $145.56 per square foot. (*Id.* at 99.) He concluded an indicated value of $165 per square foot for the subject property's fitness and activity spaces, for a total value $6,195,000, rounded, for those spaces. (*Id.* at 98.)

Powell determined that "[a] lower value is warranted for the area allocated to the tennis facility due to the lower level of interior buildout, lack of air conditioning, and location within the floodplain." (Ptfs' Ex 1 at 98.) He determined the subject property's tennis space was best bracketed by sales 1 and 2. (*Id.*) Sale 1 was the 70,866 square-foot Courtsports Athletic Club facility in Eugene, which was built in 1978 and later renovated before it sold for $59.13 per square foot in March 2012. (*Id.* at 99.) Powell wrote that sale 1 "was an REO transaction from Siuslaw Valley Bank." (*Id.* at 93.) He determined that sale 1's location was superior; but it lacked tennis facilities, and its condition and quality were inferior to the subject property. (*Id.* at 94.)

Powell's sale 2 was the 41,905 square-foot Courtside Fitness facility in Salem, which was built in 1973, remodeled once in 1987, and remodeled again before it was sold in December 2012 for $33.41 per square-foot. (Ptfs' Ex 1 at 94, 99.) Powell wrote that sale 2 was originally a

warehouse, but is now a tennis facility with six indoor tennis courts, offices, locker rooms, and reception area. (*Id.* at 94.) He concluded sale 2 was inferior in condition and quality to the subject property and also lacked its amenities. (*Id.*) Powell determined an indicated value of $75 per square foot for the subject property's tennis space, for a total value of $3,900,000, rounded, for that space. (*Id.* at 98.) He concluded the subject property's total real market value under the sales comparison approach was $10,095,000, or $112.75 per square-foot. (*Id.* at 98.)

Sohm testified that he could not find any truly comparable sales of tennis centers on or after January 1, 2010, in Oregon, Washington, Idaho, or northern California. (*See* Def's Ex A at 76.) He testified that he reviewed five sales of fitness centers to provide a check on his cost approach value conclusion. (*See id.*) Of those properties, Sohm selected two sales and one listing as most comparable to the subject property. (*Id.*) Sohm's sale 1 was a 45,172 square-foot 24-Hour Fitness facility built in 2010 on 3.44 acres located in Beaverton about 14.5 miles from the subject property. (*Id.* at 76-77.) It sold in July 2011 for $287.79 per square foot. (*Id.* at 76.) Sohm's sale 2 was a "two building mixed use property that includes 24-Hour Fitness as the major tenant in a mixed retail area of southeast Portland" about 13 miles from the subject property. (*Id.* at 78.) The 43,560 square-foot fitness facility was two years old at the time it sold in December 2011 for $244.92 per square foot. (*Id.* at 76, 78.) Sohm testified that he made downward adjustments to sales 1 and 2 because they have indoor lap pools, are located in commercial zones, have lower land to building ratios. (*See id.* at 77-78.) He wrote that both sales lack "the area devoted to tennis courts that is less expensive to build and maintain." (*Id.*)

Sohm's comparable listing was the Duniway Park facility, used by Powell as his pending sale 6. (*See id.* at 79; Ptfs' Ex 1 at 86.) Sohm wrote that the listing agent noted "substantial deferred maintenance in this structure[.]" (Def's Ex A at 79.) Sohm adjusted the listing price

downward for land value, quality, and "to reflect the impact of negotiation" due to the listing status, and upward for age and condition. (*Id.*) He placed the most weight on sale 1 and concluded a value of $185 per square foot, or $15,969,755, to which he added $115,088 for the subject property's undevelopable land, for a total indicated real market value of $16,084,843 under the sales comparison approach. (*Id.* at 80.)

### 3. Income Approach

Powell testified that the subject property's actual leases were not arm's-length, so he did not rely upon them.[7] (*See* Ptfs' Ex 1 at 82.) He reviewed five arm's-length leases and one lease listing to determine potential gross income. (*Id.* 82-88.) The leases were of facilities ranging in size from 45,000 to 68,600 square feet of rentable space with adjusted annual rent ranging from $8.76 to $28.50 per square foot, triple net. (*Id.* at 83, 88.) Powell testified that none of the leases were of combination fitness and tennis facilities. None of the leases included tennis courts. (*Id.* at 83-88.) Powell concluded that leases 1 and 4 best bracketed the subject property. (*Id.* at 86.)

Powell's lease 1 was a 45,000-square-foot build-to-suit 24-Hour Fitness facility in Vancouver, Washington. (Ptfs' Ex 1 at 83.) Lease 1 was built and leased in September 2008 for a 15-year term with an initial annual rent of $19.00 per square foot for the first five years and subsequent increases every five years. (*Id.*) As of the assessment date, lease 1 was still rented at $19.00 per square foot annually. (*Id.*) Lease 4 was a 10-year lease of the Riverplace Athletic Center in downtown Portland that began in October 2012. (*Id.* at 85.) The facility was built in 1987 and renovated in 2007. (*Id.* at 85, 88.) Lease 4 was "as-is" and included three months of free rent. (*Id.* at 85.) It was leased by the bank that repossessed the property from the original

---

[7] The subject property is leased to a related entity. (Ptfs' Ex 1 at 82; Def's Ex A at 12.) Powell determined the lease to Therapeutic Associates was also not arm's-length. (Ptfs' Ex 1 at 82.)

owner before the bank sold the property. (*Id.*) Lease 4 began at $15.20 per square foot annually with subsequent increases in years three, five, and every year thereafter. (*Id.*)

Powell concluded that lease 1 was superior to the subject property because it included an indoor swimming pool, had a parking ratio of 4.51 per 1,000 square feet of the facility, and was located in a "more commercial[ly] oriented neighborhood * * *." (Ptfs' Ex 1 at 83.) He concluded lease 4's location was superior, but its condition and quality were inferior, writing that lease 4 "suffered from poor management and deferred maintenance[]" before renovation and leasing by the bank. (*Id.* at 85.) Powell concluded an annual lease rate of $16.00 per square foot for the subject property's fitness and activity spaces and $10.00 per square foot for its tennis space. (*Id.* at 87.) Powell wrote that a lower rent for the tennis space is due to "the lower level of interior buildout, lack of air conditioning, and location within the floodplain." (*Id.* at 87.)

Powell concluded potential gross income of $1,120,716 for the subject property from which he subtracted 7.5 percent vacancy and credit loss for effective gross income of $1,036,662. (Ptfs' Ex 1 at 92.) He subtracted 3 percent for management and 4 percent for replacement reserves for a net operating income of $964,096. (*Id.*) Powell testified that he determined a capitalization rate based on his comparable sales and conversations with brokers. (*See id.* at 99.) He testified that a broker told him that a typical capitalization rate for stabilized clubs is eight to nine percent, but he selected a higher rate of 9.75 percent because the subject property was not stabilized. Powell concluded an indicated real market value under the income approach of $9,890,000, or $110.46 per square-foot, for the subject property. (*Id.* at 92.)

Sohm wrote that he did not complete an income approach for the subject property for several reasons. (*See* Def's Ex A at 81.) He determined that the subject property's income had not yet stabilized. (*Id.*) Sohm testified that he was unable to obtain income and expense data

from comparable facilities and he did not think Powell's leases were comparable. He determined that available national data was inapplicable to the subject property because it "is dominated by other regions where typical operations involve court time fees in addition to membership dues. Clubs in the northwest rely on dues and do not charge time fees." (*Id.*) Finally, Sohm testified that he found that most tennis clubs are owner occupied. (*See id.* at 65.)

### 4. Final Value Conclusion and Requested Values

Powell wrote that he relied on all three valuation approaches, placing "significant" emphasis on the income and sales comparison approaches and "secondary emphasis" on the cost approach. (Ptfs' Ex 1 at 104.) He determined that the disparity between the cost approach and the other approaches indicates the subject property "clearly includes superadequacies." (*Id.*) Powell concluded the subject property's real market value as of January 1, 2013, would have been $10,000,000, "assuming construction was 100% complete and [it] was operating at a stabilized level * * *." (*Id.* at 105.) Powell testified that he deducted the cost to complete the subject property, which he calculated to be $190,000, as well as absorption costs of $2,005,000, which included $1,890,000 "rent loss" and $115,000 "leasing commission." (*See id.* at 105-06.) He testified that he estimated a stabilization date of September 1, 2016, based on a linear trend line of membership at the subject property. (*See id.* at 105.) Powell explained that his rent loss deduction was calculated based on the percentage of memberships required to achieve stabilized occupancy as of the assessment date. (*Id.* at 105.) He deducted leasing commissions because "[t]ypically a broker would be involved in the leasing of vacant space. Therefore, leasing commissions are included in the absorption analysis." (*Id.* at 106.) Powell wrote that his final as-is real market value conclusion for the subject property was $7,805,000, or $87.18 per square-foot. (*Id.*)

Sohm relied on the cost approach and the sales comparison approaches, but gave "little credence" to the sales comparison approach because comparable sales data was limited. (Def's Ex A at 82.) However, Sohm found that his cost approach conclusion was supported by the available data under the sales comparison approach. (*Id.*) Sohm's final real market value conclusion for the subject property as of January 1, 2013, was $15,473,000. (*Id.*)

The subject property's 2013-14 tax roll real market value was $12,774,442, with $2,916,342 allocated to the land and $9,858,100 to the buildings. (Def's Ex A at 20.) Its 2013-14 exception real market value was $10,722,548. (*Id.*) Its 2013-14 maximum assessed value and assessed value were both $10,031,592. (*Id.*)

## II. ANALYSIS

The issue before the court is the 2013-14 real market value and exception value of the subject property. ORS 308.205(1) defines real market value as:[8]

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

January 1, 2013, was the assessment date for the 2013-14 tax year. *See* ORS 308.007(a); ORS 308.210. To determine a property's real market value, ORS 308.205(2) requires use of "methods and procedures in accordance with rules adopted by the Department of Revenue." The relevant rule names the three valuation approaches that must be considered: the cost, sales comparison, and income approaches. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Which approach is most persuasive is a question of fact that the court will determine on the record before it. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

---

[8] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

The exception real market value is the real market value of "new property or new improvements" in existence as of January 1, 2013. *See* ORS 308.146(3)(a); 308.153(2)(a).

Plaintiffs bear the burden to prove their case by a preponderance of the evidence. *See* ORS 305.427. A preponderance means "the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To carry their burden, Plaintiffs must demonstrate "competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)) (internal quotation marks omitted). This court has jurisdiction to determine the real market value "on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A. *Highest and Best Use; Characterization of the Subject Property; and Market*

Highest and best use is "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e). Both appraisers concluded that the subject property's highest and best use if vacant would be a residential development and that its highest and best use as improved is its current use.

Plaintiffs wrote that "[o]ne threshold issue that arose during trial was whether the subject property is a tennis center or a multi-purpose fitness facility." (Ptfs' Post-Trial Br at 2.) In Plaintiffs' view, the subject property is fundamentally a multi-purpose fitness facility. (*See id.*) They acknowledged that the largest part of the subject property, 58 percent, is dedicated to the indoor tennis courts, but noted that "[m]ore revenue is generated by the fitness memberships than by the tennis memberships because there are more fitness members than tennis members." (*Id.*

at 2-3.)  Defendant agreed that the subject property is a multi-purpose facility,[9] but asserted that the it is "a unique property that should be valued under the loss to owner standard" in ORS 308.205(2)(c) because it lacks an active or immediate market.  (Def's Closing Br at 5-6.)

If a property has no immediate market, then only the cost and income approaches may be used to determine its value.  OAR 150-308.205-(A)(3); s*ee also Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 728-29, 801 P2d 809 (1990) (concluding the cost approach was the preferred valuation method given lack of sufficiently similar sales); *Les Schwab Tire Centers v. Crook County Assessor*, 14 OTR 588, 594 (1999), ("no comparable sales or rentals within a reasonable distance, time, and proximity" renders a property devoid of an immediate market).

A proper characterization of the subject property and its market is, therefore, necessary to determine which approaches to value are relevant and to select comparable sales and leases, if any.  The court agrees with Plaintiffs that the subject property is a multi-purpose facility, but does not agree that the tennis aspect may be disregarded; it is a significant part of the subject property facility and contributes financially to its operations.  The court is not persuaded that the subject property lacks an immediate market under OAR 150-305.205-(A)(3).  That rule discusses "especial property," which is defined as "property specially designed, equipped, and used for a specific operation or use that is beneficial to only one particular user."  OAR 150-308.205-(A)(3).  As Plaintiffs correctly stated, the subject property is not "beneficial to only one user or designed for only one specific use.  Anyone could purchase this facility; it would have value in the hands of a different owner."  (Ptfs' Post-Trial Br at 4.)  Indeed, Sohm identified nine tennis centers and two fitness facilities that compete with the subject property in its market area.

///

---

[9] In its closing brief, Defendant described the subject property as a "fitness, wellness, aquatic, and tennis center."  (Def's Closing Br at 1.)

Although the court is not persuaded that the subject property is an especial property that lacks an immediate market, the court notes that it is important to ensure that sufficiently similar sales are available for the sales comparison approach to provide a reliable value indication. *See Hewlett-Packard v Benton County Assessor*, 21 OTR 186, 193 (2013) (disapproving of appraiser's reliance on sales with significant size and use differences that "did not necessarily reflect the actions of buyers that would purchase the subject property"). The court reviews that evidence below.

B.      *Sales Comparison Approach*

Under the sales comparison approach, "only actual market transactions of property comparable to the subject property, or adjusted to be comparable," may be used and all sales "must be verified to ensure they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Mar 26, 2003.)

Powell relied on five sales and one pending sale in his sales comparison approach. None of Powell's sales included the same mix of uses as the subject property, so Powell separately analyzed the value of the subject property's fitness space and its tennis space. He placed the most weight on sale 5 and pending sale 6 to determine the value of the subject property's fitness space. Powell's sale 5 was a 28 year old property sold by the lender after repossession. It suffered from deferred maintenance and was of inferior quality and condition to the subject property. Nevertheless, Powell concluded a value for the subject property's fitness space ($165.00 per square foot) that was less than that of sale 5 ($173.99 per square foot). Pending sale 6 was a 37 year old property with "significant deferred maintenance." The court is not

persuaded that either sale 5 or pending sale 6 is comparable to the subject property's fitness space based on their ages, conditions, and the fact that sale 5 was a distressed sale by the lender following repossession.

Powell placed the most weight on sales 1 and 2 to determine the value of the subject property's tennis space. Sale 1 was 34 years old and sale 2 was 39 years old. Both sales were inferior to the subject property in condition and quality. Neither sale was located near Tualatin; sale 1 was in Eugene and sale 2 was in Salem. Sale 1 was a distressed REO sale. Powell used sale 1 to value the subject property's tennis space, despite the fact that it lacked tennis facilities. The court concludes that Powell's sales 1 and 2 are not comparable to the subject property's tennis space. Moreover, it is unclear how Powell selected a value of $75 per square foot, or $3.9 million, for the subject property's tennis space. None of Powell's sales support that value and it is less than the cost calculated by Powell to build replacement tennis facilities.

As Defendant noted, an examination of comparable sales must ask "whether the buyer * * * would seriously consider the subject property as an alternative to the property that he/she chose." (Def's Closing Br at 9 (citing Appraisal Institute, *The Appraisal of Real Estate* 394 (14th Ed 2013).) The court agrees and finds that none of Powell's sales were sufficiently similar to the subject property to provide a reliable value indication. Although Sohm completed a sales comparison approach, he testified that he placed little to no weight on it because he did not find any sales sufficiently similar to the subject property. The sales comparison approach is unpersuasive.

C.    *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v.*

*Dept. of Rev.*, 17 OTR 248, 253 (2003). "The direct capitalization method used [here] * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* To calculate net operating income, "appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254.

Both appraisers agreed that the subject property was not stabilized as of the assessment date. In addition, they agreed that the subject property's actual leases were not arm's-length. As a result, Powell relied upon leases of properties he considered comparable to determine potential gross income for the subject property. None of Powell's leases included the same mix of uses as the subject property and none included tennis facilities. The court finds Powell's comparable leases unpersuasive for similar reasons that it found his comparable sales unpersuasive.

Powell placed the most weight on leases 1 and 4. Lease 1 was a 24-Hour Fitness facility located in Vancouver, Washington that was built and leased in 2008. That property is more similar to the subject property than the much older facilities built in the 1970s. However, a 2008 lease likely reflects different market conditions and is not, therefore, persuasive evidence of lease rates as of January 1, 2013, absent appropriate adjustments. Powell's lease 4 was an as-is lease of a facility built in 1987 that suffered from deferred maintenance. It was leased by a bank following repossession and prior to the bank's sale of that property. Those properties are not comparable to the subject property as a whole, or even to its fitness space. Powell's lease rate conclusion for the subject property's tennis space is not supported by any evidence.

Sohm testified that he considered an income approach but did not complete one because he was unable to obtain lease information from any comparable properties, he did not consider national data to be relevant to the subject property, and he found that most tennis clubs were owner occupied. Citing this court's opinion in *Dept. of Rev. v. River's Edge Inv., LLC* (*River's*

*Edge*), 21 OTR 469, 474-75 (2014). Plaintiffs argued that Sohm's failure to complete an income approach represents "a serious departure from appraisal practice[]" and renders his appraisal unreliable. (Ptfs' Post-Trial Br at 5.) In *River's Edge*, this court wrote that, "[i]f not adequately justified," an appraiser's failure to complete an income approach "would lead the court to place no reliance on the appraisal of the expert who took the departure." *River's Edge*, 21 OTR at 475. Here, Sohm adequately justified his failure to complete an income approach. The court's review of Powell's income approach supports Sohm's conclusion that insufficient comparable leases were available to provide a reliable real market value indication under the income approach as of January 1, 2013.

D. *Cost Approach*

Under the cost approach, the real market value of a property is determined "by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (quoting Appraisal Institute, *The Appraisal of Real Estate* 63(12th ed 2001)) (alteration in original) (internal quotation marks omitted). The cost approach is especially persuasive when, as here, the subject property improvements are relatively new. *See id.*

Both appraisers considered the actual cost to construct the subject property and the replacement cost estimated using MVS. Both appraisers ultimately relied on the subject property's actual construction costs. Powell concluded an indicated value of $10,515,000 and Sohm concluded an indicated value of $15,473,000. That difference is due to the appraisers' land real market value conclusions, their indirect cost estimations, and Powell's 35 percent

/ / /

deduction for functional obsolescence. Powell acknowledged that his cost approach conclusion would be $15,315,000 without the deduction for functional obsolescence.

        1.     Land Value

Powell and Sohm each considered several sales of residential zoned land as comparable to the subject property's 4.9 developable acres. One of those was the same sale: a May 2011 sale of 19.43 acres purchased by the City of Tigard "for future park space." Powell determined that sale bracketed the subject property on the low end, whereas Sohm concluded a real market value for the subject property's 4.9 developable acres below the price of that sale. Powell concluded a value of $325,000 per acre by bracketing the subject property's developable land between two land sales. Sohm concluded a value of about $5 per square foot for the subject property's 4.9 developable acres. That value is less than the price of any of Sohm's comparable land sales; thus, he failed to bracket the subject property's developable land.

Powell assigned no value to the subject property's 10.6 undevelopable acres because it would not be cost-effective to mitigate that land. He concluded the subject property's total land real market value was $1,600,000. Sohm considered several sales of open space as comparable to the subject property's undevelopable land and concluded a value of $11,250 per acre for that land. He concluded a total real market value of $1,184,488 for the subject property's bare land.

The court agrees with Sohm that the subject property's undevelopable land may have value as open space, but concludes that his analysis of that value was incomplete. Use of the subject property's undevelopable land as open space is a different highest and best use than residential development, indicating that a different buyer would be interested in that land.[10] However, Sohm did not analyze whether the subject property land could be partitioned or the

---

[10] The buyers that Sohm "indicates would be interested in the undevelopable portion would not be the type of buyers or investors that would be looking to acquire the entire property." (Ptfs' Post-Trial Br at 19.)

cost of doing so. Ultimately, the court finds Powell's 2013-14 bare land real market value conclusion of $1,600,000 to be more persuasive and accepts his determination.

2.      Improvements Value

Powell and Sohm both relied on the subject property's actual construction costs of $11,201,595. Zupancic testified that, of that amount, a $319,000 bid for "Solar PV" should be removed because the work never happened. That indicates an actual cost of $10,882,595. Powell calculated indirect costs of 10 percent whereas Sohm used 15 percent. The court accepts Powell's determination of 10 percent indirect costs, or $1,088,260, rather than 15 percent because Sohm's determination was based on his conclusion that the subject property was a specialized property. Adding the land value of $1,600,000 and 10 percent entrepreneurial profit results in an indicated real market value of $14,928,000, rounded, under the cost approach.

Powell deducted 35 percent for functional obsolescence, which he measured based on the difference between his value conclusions under the cost approach as compared with the other approaches to value. As Defendant correctly noted, that is not one of the accepted methods of measuring functional obsolescence.[11] (Def's Closing Br at 15 (citing Appraisal Institute, *The Appraisal of Real Estate* 623-28 (14th ed 2013).) Furthermore, as Sohm testified, even if there were functional obsolescence due to a superadequacy, its cost should be capitalized over the life of the subject property. (*See id.*) Powell's calculation of a 35 percent deduction for functional obsolescence is not supported by appraisal methodology and is unpersuasive in this case.

Zupancic testified that that the $1.4 million cost of wetlands mitigation was extraordinary and should be deducted from the cost approach conclusion. (*See* Ptfs' Post-Trial Br at 13 n1.)

---

[11] "The three principal methods for estimating depreciation are the market extraction method[,] the economic age-life method[, and] the breakdown method." Appraisal Institute, *The Appraisal of Real Estate* 597 (14th Ed 2013).

The court disagrees. Plaintiffs' evidence demonstrated they were required to complete wetlands mitigation before the City of Tualatin would grant the conditional use permit for the subject property. Thus, those costs were necessary and any buyer would have incurred them. Plaintiffs did not present any evidence of "ordinary" site development costs based on which the court could conclude that the subject property's site development costs were "extraordinary."

Plaintiffs noted other governmental restrictions impacting the subject property, including restrictions on parking and operating hours, mandatory wetlands maintenance, mandatory flood insurance, and the possibility of losing their non-conforming use exemption. The court acknowledges that each of those restrictions or requirements may negatively impact the subject property's real market value. Governmental restrictions must be considered when determining real market value. *See* ORS 305.205(2)(d). However, Plaintiffs have failed to present evidence of the specific effect of those restrictions on the subject property's real market value.

E.     *Reconciliation*

The court finds that the cost approach provides the best evidence of the subject property's real market value as of January 1, 2013, and indicates a real market value of $14,928,000. Powell determined that "absorption costs" totaling $2,005,000 should be deducted from the final value conclusion. Those costs included $1,890,000 for "rent loss" and $115,000 for "leasing commissions." Powell based those deductions on the percentage of memberships required to achieve stabilized occupancy of the subject property. The court concludes that Powell's deductions are unsupported. The subject property is not leased to the members and no evidence was presented that market lease rates are contingent upon specific membership levels. Similarly, no evidence was presented that connects membership levels with leasing commissions.

/ / /

Powell and Zupancic each testified that the subject property was 97.6 percent complete as of January 1, 2013, and the court found their testimony persuasive. Powell calculated that a deduction of $190,000 should be made for the cost to complete the subject property, whereas Zupancic testified that the deduction should be $300,000. (*See* Ptfs' Post-Trial Br at 13 n1.) The court finds that a downward adjustment of 2.4 percent, or $358,300, rounded, is supported for the cost to complete the subject property. The court finds that the subject property's real market value was $14,569,700 as of January 1, 2013. The court concludes that its 2013-14 exception real market value was $12,969,700.

III. CONCLUSION

After careful consideration, the court finds that the cost approach provides the best real market value evidence in this case. The court further finds that the subject property was 97.6 percent complete as of January 1, 2013, and its real market value on that date was $14,569,700. The court concludes that the subject property's 2013-14 exception real market value was $12,969,700. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2013-14 real market value of property identified as Account 00345380 was $14,569,700. Its 2013-14 exception real market value was $12,969,700.

Dated this ____ day of May 2015

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by* <u>*mailing*</u> *to: 1163 State Street, Salem, OR 97301-2563; or by* <u>*hand delivery*</u> *to: Fourth Floor, 1241 State Street, Salem, OR. Your complaint must be submitted within* <u>*60*</u> *days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on May 18, 2015.*